UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| JEANNE V. PERIARD ) <br> (Social Security No. XXX-XX-4061), ) <br>                                       ) <br>                   Plaintiff,      ) <br>                                       ) <br>       v.                            )       3:06-cv-47-RLY-WGH <br>                                       ) <br> MICHAEL J. ASTRUE, COMMISSIONER ) <br> OF SOCIAL SECURITY,[1]        ) <br>                                       ) <br>                   Defendant.   ) | |

## MEMORANDUM DECISION AND ORDER

### I. Statement of the Case

Plaintiff, Jeanne V. Periard, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Social Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d), 1381(a); 20 C.F.R. § 404.1520(f). The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on June 3, 2003, and August 1, 2003, respectively, alleging disability since June 23, 2000.[2] (R. 68-70, 355-57). The agency denied Plaintiff's

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official capacity only, is substituted as the defendant in this action.

[2] Plaintiff eventually amended her alleged onset date to July 27, 2001, after it became clear at her hearing before the ALJ that she had quit her job in 2000 due to a move and not any disability. (R. 382-83). Therefore, based on Plaintiff's amended onset date, the relevant time frame began on July 27, 2001.

application both initially and on reconsideration. (R. 32-40, 358-65). Plaintiff appeared at a hearing before Administrative Law Judge ("ALJ") George Mills III on January 4, 2005, and was advised that she could appear with counsel to represent her if she so chose. (R. 366-73). The hearing was continued until Plaintiff could obtain counsel, and Plaintiff again appeared and testified before ALJ Marsha Stroup on May 3, 2005. (R. 374-409). Plaintiff was represented at the hearing by her attorney, Michael Hayden. (R. 374). Also testifying was a vocational expert ("VE"). The ALJ issued a decision on July 20, 2005, finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past work as a receptionist as well as a significant number of jobs in the regional economy. (R. 17-24). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 10-12). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on March 9, 2006, seeking judicial review of the ALJ's decision.

## II. Medical Evidence

On October 22, 2001, John O. Grimm, M.D., an orthopaedic surgeon, examined Plaintiff, who reported that she developed pain in her neck, shoulders, arms, low back and hips after a motor vehicle accident in July 2001. (R. 146). She reported that she had been treated by her family doctor, Dr. Thompson, with physical therapy, non-steroidal anti-inflammatory medications and steroid injections. On examination Plaintiff had tenderness in her cervical spine, but exhibited a full range of cervical motion and no sensory or motor deficits in the upper extremities. (R. 147). She had some tenderness in the lumbar spine, but

75 degrees of flexion and 10 degrees of extension and no evidence of sensory or motor deficits in her lower extremities. In addition, she had normal posture and a normal gait. X-rays showed that the disc height of her cervical spine was preserved and there were no significant hypertrophic changes.

Images of Plaintiff's lumbar spine also showed well-preserved disc height with no evidence of fracture, subluxation or spondylolysis. A computerized tomography ("CT") scan revealed a "mild" diffuse lumbar bulge at L4-5 and L5-S1. The diagnosis was cervical and lumbar sprain/strain of a "subacute" nature. (R. 147).

When Dr. Grimm saw Plaintiff on November 5, 2001, she indicated that her neck and shoulder pain had improved, but that she still had severe lower back pain. (R. 145). An MRI of the lumbar spine showed no evidence of stenosis or disc herniation, fracture or subluxation, and a possible posterior annular tear at L5-S1. Additionally, an MRI of the cervical spine showed no herniation, foraminal stenosis on the right at C5-6 secondary to hypertropic spondylotic changes, and a possible annular tear. (R. 145).

On November 20, 2001, Dr. Grimm performed a lumbar discogram that showed a posterior annular tear at L4-5 with no evidence of canal encroachment. (R. 144-45). On February 2, 2002, Plaintiff saw Michael Miller, D.O., who noted that she was using a cane to assist with ambulation. (R. 161). She stated that she needed to lie on one side with a pillow between her legs to ease her pain. Dr. Miller concluded that she had lumbar radiculopathy, which he treated with lumbar epidural steroid injections, Lortab and Valium. (R. 161-62). On March 25, 2002, Plaintiff underwent IDET (intradiscal electrothermal treatment), which provided no relief, but by June 11, 2002, she had reportedly experienced

improvement in her symptoms with exercise in a swimming pool. (R. 225). She no longer needed her cane at that time.

On July 24, 2002, Plaintiff saw Joseph Waling, M.D., a specialist in physical medicine and rehabilitation, to whom she reported back pain exacerbated by bending, stooping, lifting, twisting and lying down. (R. 188-89). She rated her pain at 7/10 at best and 10/10 at worst and alleged a need to change positions frequently. She was taking Hydrocodone and Baclofen. On examination, sensation and motor strength were normal. She stated that she performed no regular household duties.

On October 21, 2002, an MRI revealed mild central disc bulges at T12–L1 and L5-S1 and facet and ligamentous hypertrophy at multiple levels, but there was no evidence of measurable spinal stenosis or herniation. (R. 249). In November 2002, Plaintiff reported that she had been involved in another motor vehicle accident, which she claimed worsened her symptoms. (R. 217).

On January 13, 2003, Matthew Kern, M.D., a neurosurgeon, performed an L5-S1 decompressive laminectomy and fusion. (R. 165-66).

On March 12, 2003, Plaintiff was seen by Dr. Kern who reported that, two months removed from the surgery, Plaintiff was still having trouble sleeping, was depressed, and was having low back pain, but no real leg pain. (R. 210). Dr. Kern reported that x-rays revealed excellent placement of the instrumentation and ongoing fusion. Dr. Kern opined that Plaintiff should remain in the corset she had been prescribed, and he prescribed Ambien for her difficulty with sleeping. (R. 210).

On August 6, 2003, Plaintiff told Dr. Waling that, while babysitting her grandson, she

tried to catch him and fell, resulting in increased pain. (R. 181). X-rays taken the following day indicated that the hardware in Plaintiff's back was intact. (R. 243).

On October 2, 2003, Plaintiff was examined by Kip Beard, M.D., an internist, at the request of the state agency. (R. 198-204). Plaintiff complained of constant lower back pain with intermittent radiation into her hips and left leg, as well as bilateral leg weakness. (R. 198). At that time, she was taking Duragesic, Zoloft, Hydrocodone, Neurontin and Trazodone. (R. 199). Dr. Beard noted that although Plaintiff walked with a slow-paced and guarded gait, she did not use an assistive device and showed no limp. (R. 200). She seemed to have a mild degree of difficulty raising up from a seated position and getting on and off the examination table.

On examination by Dr. Beard, Plaintiff showed no tenderness and had a normal range of motion in her cervical spine, shoulders, elbows and wrists, as well as a full range of motion in both hands with the ability to pick up coins with either hand. (R. 201-02, 204). The examination of her knees, ankles and feet was also unremarkable. (R. 202). Examination of the lumbar spine revealed diminished lumbar lordosis, evidence of paravertebral tenderness, and mild muscle rigidity without spasm. She had some limitation of motion of the lumbar spine, but no lower extremity weakness. Sensation was intact, reflexes were normal, and Plaintiff could walk on her heels and toes and walk heel to toes. (R. 202). She could squat two-thirds of the way and had difficulty arising. Dr. Beard concluded that Plaintiff may have difficulty with prolonged sitting and standing and some difficulty lifting and carrying. (R. 203).

An MRI of Plaintiff's lumbar spine in October 2003 showed no new problems. (R.

242).  A CT scan showed L3-L4 bulging with facet joint hypertrophy creating no lateral stenosis, as well as no evidence of disc herniation.  (R. 239).

While he noted that a myelogram indicated spondylolisthesis at L3-4, Dr. Kern stated that these tests showed a stable fusion, with good placement of all of the instrumentation, and that he did not see evidence of spondylolisthesis at L3-4.  (R. 205, 237).  He stated that he had nothing further to offer Plaintiff other than the removal of her instrumentation (which she decided against) or insertion of a dorsal column stimulator (which she wanted to try if she could get approved).  (R. 205).

On January 19, 2004, Dr. Kern implanted a dorsal column stimulator in view of Plaintiff's multiple failed conservative therapies and Plaintiff's failure to respond to the fusion surgery.  (R. 259-60, 265).  Notes from Dr. Kern indicate that "[t]here is really no evidence of any instability or any spinal listhesis at any of her levels and the fact that she is solidly fused, no further surgeries as far as instrument placement is really recommended for her at this time."  (R. 259).  During the pre-surgery work-up, Plaintiff reported complaints of low back pain, but no upper or lower extremity pain or weakness and no difficulty with gate or balance.  Plaintiff appeared uncomfortable, but was not really in any acute distress.  Plaintiff displayed upper and lower extremity strength that was "equal and appropriate with full range of motion throughout."  (R. 260).  Also during the pre-surgery work-up, an electrocardiogram was abnormal, and Plaintiff reported a five to six year history of palpitations with some dyspnea and tightness in her chest.  She was subsequently diagnosed with Wolff-Parkinson-White syndrome, an abnormality of cardiac rhythm.  (R. 293).

On February 23, 2004, a Functional Capacity Assessment form was provided by a state

agency physician, T. Crawford, M.D., which indicated that Plaintiff could lift 20 pounds occasionally, ten pounds frequently, could only climb, bend, stoop, kneel, crawl or crouch occasionally, and needed to avoid even moderate exposure to environmental hazards such as extreme cold or heat, wetness, humidity, noise, vibration, fumes or hazardous machinery. (R. 117-24).

On April 7, 2004, Dr. Kern removed Plaintiff's dorsal column stimulator, which had not helped her and had stopped working. (R. 263-65). On April 15, 2005, Dr. Kern reported that Plaintiff stated that she was "miserable" and could barely move. (R. 267). He noted that her incisions were well-healed, she may have had a slight allergic skin reaction, and he was going to discharge her to the care of her primary doctor. The doctor noted that Plaintiff left the office making very negative comments.

About a month later, on May 13, 2004, Plaintiff called The Heart Group asking for medication for chronic back pain, but was informed that her cardiologist's office did not prescribe that type of medication. (R. 286).

Electrophysiology studies performed on May 28, 2004, revealed inducible supraventricular tachycardia for which Plaintiff underwent radiofrequency ablation. (R. 275, 277-79). The procedure was performed by Chandrashekar Kumbar, M.D.

In August 2004, Plaintiff sought treatment at Advanced Pain Care, where she alleged that "anything" increased her back pain and that her pain was at its worst when she was seated. (R. 350). She was prescribed Ultram and Flexeril and later Lortab and Celebrex. (R. 347, 349). As of that time, Plaintiff's neurological examination remained grossly intact. (R. 351).

Plaintiff's cardiovascular disease specialist at The Heart Group was Umesh C. Jairath, M.D. On November 12, 2004, someone at The Heart Group completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) that indicated that Plaintiff could perform very limited physical activities. (R. 282-85). The form stated several times that the limitations were due to her back, not her heart condition, and that her back doctor should be contacted. As the ALJ pointed out, this form bore the signature of Dr. Jairath, but the signature was not his handwriting. (R. 21-22, 285).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she

suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 24). The ALJ continued by finding that, in accordance with 20 C.F.R. § 416.920(b), Plaintiff had two impairments that are classified as severe: degenerative disc disease, status-post laminectomy and fusion at L 5-F1, and Wolff-Parkinson-White Syndrome, status-post radiofrequency ablation. (R. 24). The ALJ concluded that none of these impairments met or were substantially similar to any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24). Additionally, the ALJ opined that Plaintiff's

allegations regarding the severity and extent of her limitations were not fully credible. (R. 24). Consequently, the ALJ concluded that Plaintiff retained the RFC to lift and/or carry up to ten pounds, stand at least two hours during an eight-hour work day, and sit about six of eight hours with a sit/stand option and could occasionally climb, balance, stoop, kneel, crouch or crawl. But, Plaintiff could never climb ladders, ropes or scaffolding, and she would need to avoid moderate exposure to temperature extremes, wetness/humidity, noise, vibration and hazards such as machinery and heights. (R. 24). The ALJ determined that Plaintiff could perform her past work as a receptionist. (R. 24). The ALJ also went on to conclude that, based on her limitations, Plaintiff retained the RFC to perform a limited range of sedentary work existing in substantial numbers in the regional economy. (R. 24). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 24).

## VI. Issues

The court concludes that Plaintiff has essentially raised two issues. The issues are as follows:

1. Is the ALJ's decision supported by substantial evidence?
2. Did the ALJ engage in a proper assessment of Plaintiff's credibility?

**Issue 1: Is the ALJ's decision supported by substantial evidence?**

Plaintiff first argues that the ALJ's decision is not supported by substantial evidence. However, while there is evidence that Plaintiff continued to seek treatment for her back pain after her fusion surgery, there is evidence which a reasonable ALJ could have relied on to conclude that Plaintiff retains the RFC to do sedentary work with some limitations. The ALJ

-10-

reasonably relied on the MRI of Plaintiff's lumbar spine from October 2003 (R. 242), the CT scan (R. 239), and Dr. Kern's interpretation of Plaintiff's myelogram (R. 202, 237), all of which did not indicate any physical problems that could lead to the extent of pain Plaintiff was reporting. The ALJ also reasonably relied on the October 2003 consultative exam by Kip Beard, M.D. (R. 198-204) and the February 13, 2004 state-agency produced functional capacity form. (R. 117-24). Of additional note in the record was a pre-surgery work-up from January 2004 which did not reveal the types of limitations in range of motion or muscle strength one would expect to see if Plaintiff's limitations were as harsh as she claims. (R. 260).

The court is reminded that it may not re-weigh the evidence. *Butera,* 173 F.3d at 1055. While there is a form filled out with Dr. Jairath's signature (R. 282-85) with limitations that would preclude sedentary work, the ALJ raised concerns about its authenticity and, more importantly, there is certainly substantial evidence in the record which contradicts the findings in that form. Nothing else in the record leads the court to conclude that the ALJ's decision was unreasonable. Because the ALJ's opinion concerning Plaintiff's back pain is supported by substantial evidence, the ALJ's decision on this issue is **AFFIRMED.**

**Issue 2: Did the ALJ engage in a proper assessment of Plaintiff's credibility?**

Next, Plaintiff argues that the ALJ failed to conduct a proper assessment of Plaintiff's credibility. Plaintiff testified at the administrative hearing that she suffers from pain in her lower back that is an eight on a scale of one to ten. (R. 385). Plaintiff also explained that the pain radiates into her left leg. (R. 385). She testified that even with the pain medication her pain is still an eight and would be a ten if she were to discontinue use of her pain medication.

(R. 388). She also explained that she could walk two blocks, could stand for ten minutes at a time, and could sit for about 30 minutes, and that she could lift a gallon of milk which is eight or nine pounds. (R. 389-90). Plaintiff claimed that she went to bed at 10:00 p.m., and woke up at 6:00 a.m., and that in-between she has to rest for two two-hour periods during the morning and afternoon. (R. 396-97). Plaintiff opined that she could not work, even at a sit-down job, because she would be in too much pain. (R. 398). However, Plaintiff also testified that she: (1) would go to her grandson's tee-ball games; (2) would go grocery shopping and could push a grocery cart; (3) lives on the second floor of her apartment complex and can get up and down the stairs using the hand rails; (4) cooks full meals for her family; (5) takes care of her personal hygiene; and (6) occasionally drives to visit her parents who live approximately 40 miles from her home. (R. 393-96).

Examination of the ALJ's credibility determination leads the court to conclude that the ALJ made a proper determination, within the scope of 20 C.F.R. § 404.1529, that the extent of Plaintiff's complaints of pain and her opinion that she could not work even in a sedentary job were not fully credible. An ALJ's findings are generally entitled to deference and will not be overturned unless "patently wrong." *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995). The ALJ, in this instance, properly assessed Plaintiff's credibility in accordance with SSR-7p. (R. 22). The ALJ examined Plaintiffs' daily activities as well as the objective medical evidence and concluded that the degree of limitations that Plaintiff alleged were not supported by this evidence. Furthermore, the ALJ explained that there was "no evidence of spinal stenosis, herniated nucleus palposus, or spondylolisthesis, and no abnormality related to the claimant's fusion procedures . . . ." (R. 22). Nothing about the ALJ's credibility determination was

improper, and the court concludes that the ALJ's credibility determination was certainly not "patently wrong." The ALJ's decision on this issue is, therefore, **AFFIRMED.**

### VII.  Conclusion

The ALJ's decision is supported by substantial evidence and her credibility determination was not patently wrong. Therefore, the decision of the ALJ is **AFFIRMED.**

**SO ORDERED** the 26th day of March 2007.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Michael J. Hayden
mhayden@evansville.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov